# CHARLESTON.

## STATE v. WOODWARD.

Submitted June 8, 1910.    Decided October 25, 1910.

.1.    CONSTITUTIONAL LAW—*Criminal Law—Due Process—Closing Saloons on Sunday.*
   Sections 1 and 3 of chapter 14, Acts Extra Session of 1908, closing saloons on Sunday, are not unconstitutional as imposing punishment cruel or unusual or disproportionate to the offence, or depriving of property without due process.

2.    CRIMINAL LAW—*Power of Legislature—Creation of Crimes.*
   The Legislature has power to create and define crimes and fix their punishment, so only that such punishment is not cruel or unusual or disproportionate to the offence.

3.    INTOXICATING LIQUORS—*Regulation by Legislature.*
   The Legislature has power to regulate and restrict the sale of intoxicating liquor, and to revoke license and close places where sold under it upon conviction of offence against liquor law.

Error to Circuit Court, Randolph County.

James R. Woodward was convicted of keeping open a saloon on Sunday, and brings error.

                                                      *Affirmed.*

*W. B. Maxwell,* for plaintiff in error.

*William G. Conley,* Attorney General, for the State.

BRANNON, JUDGE:

By chapter 14 of the extra session of 1908, Supplement Code issued in 1909, § 933a 1, a new offense is created. In its first section it enacts, that "All rooms, except drug stores, where any of the liquors mentioned in section one, paragraph c, chapter thirty-six, acts of nineteen hundred and five, are sold or kept for sale, either at wholesale or retail, shall be kept closed and securely locked on the first day of the week, commonly called Sunday, from and after the hour of twelve o'clock Saturday night and until five o'clock on the morning of the succeeding Monday, and no person shall be permitted in such room for any purpose during the days and hours when it is by law or ordi-

nance required to be closed. All openings of every sort from such room to any other room, hall, vestibule, entrance or stairway, situated in the building, or from such room to any building or room adjoining the room in which said business is carried on, or from such room to any basement or cellar, chamber or attic, shall be kept securely closed and locked on said first day of the week." Its third section provides that any person, his agent or employee, violating the first section "shall on conviction be fined not less than fifty dollars nor more than two hundred and fifty dollars, and be imprisoned in the county jail not less than six months nor more than twelve months; and such violation by an agent or employee shall be deemed an offense as well by the principal or employer, and they may be indicted for the same either jointly or separately. The court before which such conviction is had shall as a part of its judgment revoke the license granted for the sale of spirituous liquors on said premises, and shall order that said room and premises shall not be used for the sale, storage or manufacture of such liquors for one year from and after such conviction." Under this James R. Woodward was indicted in the circuit court of Randolph county, the indictment charging that having a state license to sell at retail spirituous liquors, he did, in a certain room in which he sold and kept for sale spirituous liquors, "unlawfully unlock and open the said room and enter therein on the morning of said day, being the first day of the week commonly called Sunday." Woodward was found guilty by a jury, and the judgment was that he pay a fine of $50. and be confined in jail six months, and that his liquor license be revoked, and that the room where he sold and kept liquors for sale should not be used for the sale, storage or manufacture of such liquor for one year after the date of the judgment.

The defendant moved the court to quash the indictment and for a new trial, but the court overruled the motions. In his motion to quash the indictment he suggested that the statute is contrary to the Fourteenth Amendment of the Federal Constitution and Section 10 of Art. 3, of the State Constitution, both providing that no person shall be deprived of life, liberty or property without due process of law. We cannot see that the statute is obnoxious to that objection. It provides for the ordinary process of low by conviction on trial upon indictment. I

need not cite authority to show that this is due process of law. Surely so far as fine and imprisonment are concerned under our constitution he must be indicted and tried by his peers. This is in the highest sense due process of law under which even life may be taken. We do not think that that feature of the statute which commands the court on conviction to revoke the liquor license and to close the place of sale is any more open to constitutional objection, since that is a part of the penalty prescribed by the statute for the offense and is inflicted only after due process has been had. This matter falls under the rule that the Legislature is clothed with power well nigh unlimited to define crimes and fix their punishment. So its enactments do not deprive of life, liberty or property without due process of law and the judgment of a man's peers its will is absolute. It can take life, it can take liberty, it can take property, for crime. "The Legislatures of the different states have the inherent power to prohibit and punish any act as a crime, provided they do not violate the restrictions of the state and federal constitutions; and the courts cannot look further into the propriety of a penal statute than to ascertain whether the legislature had the power to enact it." 12 Cyc. 136. "The power of the Legislature to impose fines and penalties for a violation of its statutory requirements is coeval with government." *Mo. P. R. Co.* v. *Humes,* 115 U. S. 512. The legislature is ordinarily the judge of the expediency of creating new crimes, and of perscribing penalties, whether light or severe. *Commonwealth* v. *Murphy,* 165 Mass. 66, *Southern Express Co.* v. *Commonwealth,* 92 Va. 66. For such a fundamental proposition I need cite no further authority. As to that feature of the act forfeiting license and closing the saloon, it falls under the power to punish after conviction. It is a forfeiture which may as validly be enacted as the imposition of imprisonment and forfeiture of money. The power of the Legislature to declare what are nuisances and to authorize their removal is established clearly by authority. *Lawten* v. *Steele,* 152 U. S. 133; *Mugler* v. *Kansas,* 123 *Id.* 623; *Kidd* v. *Pearson,* 128 *Id.* 1; *Kirkland* v. *State,* and note, 2 Amer. and Eng. Anno. Cases 242, is full on this subject. When Woodward accepted his license he accepted it subject to legal regulations and surely for a violation of the law the Legislature could declare its forfeiture. And so it might au-

thorize the closing of the saloon as the instrument used in the violation of the law. Statutes providing forfeiture of liquor licenses are numerous and constitutional. Fines may be imposed and this is a fine levied on a specific article, instead of the offender's estate at large. The power is universally conceded says Bishop's Statutory Crimes, §§ 993, 1056. So license may be revoked. *Id.* § 1003a. Our very constitution gives the state power to deal with the evil resulting from intoxicating liquors in the provision that "Laws may be passed regulating or prohibiting the sale of intoxicating liquors within the limits of this state." Art. 6, § 46. This is a very great power; it is hard to say where its limits are. It may make any kind of regulations in the wisdom of the Legislature adapted to regulation. This power falls within the great police power so widespread and so necessary to a state government Though counsel for Woodward made the suggestion in the motion to quash the indictment that the act deprived of life, liberty and property without due process, he seems not to rely on it as he does not pursue it in his brief. He seems rather to base his charge of unconstitutionality on that provision of the constitution of the state, Art. 3, § 5, saying that "excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted. Penalties shall be proportioned to the character and degree of the offense." What is meant by the provision against cruel and unusual punishment? It is hard to say definitely. Here is something prohibited, and in order to say what this is we must revert to the past to ascertain what is the evil to be remedied. Within the pale of due process the Legislature has power to define crimes and fix punishments, great though they may be, limited only by the provision that they shall not be cruel or unusual or disproportionate to the character of the offense. Going back to ascertain what was intended by this constitutional provision the history of the law tells us of the terrible punishment visited by the ancient law upon convict criminals. In our days of advanced Christianity and civilization this review is most interesting, yet shocking and heartrending. Take the case of treason. Blackstone says, Book 4, page 92, that "The punishment of high treason in general is very solemn and terrible. 1. That the offender be drawn to the gallows, and not be carried or walk; though usually (by connivance, at length ripened by humanity

into law) a sledge or hurdle is allowed, to preserve the offender from the extreme torment of being dragged on the ground or pavement. 2. That he be hanged by the neck and then cut down alive. 3. That his entrails be taken out and burned while he is yet alive. 4. That his head be cut off. 5. That his body be divided into four parts. 6. That his head and quarters be at the king's disposal." Blackstone, Book 4, page 327, says: "The English judgment of penance for standing mute was as follows: that the prisoner be remanded to the prison from whence he came, and put into a low, dark chamber, and there be laid on his back on the bare floor, naked, unless where decency forbids; that there be placed upon his body as great a weight of iron as he could bear, and more; that he have no sustenance, save only, on the first day, three morsels of the worst bread; and, on the second day, three draughts of standing water, that should be nearest to the prison door; and in this situation this should be alternately his diet *till he died,* or (as anciently the judgment ran) *till he answered.*" This horrible punishment was called in old English law, in law French, *Piene forte et dure.* "In case of a woman her judgment is to be drawn and burnt as well in high treason as petit treason, and she is neither hanged nor beheaded." She was on account of sex relieved from exposure of disembowelment and being cut into four pieces. Blackstone says, Book 4, page 377, "Some punishment consists in exile or banishment, by abjuration of the realm, or transportation; others in loss of liberty, by perpetual or temporary imprisonment. Some extend to confiscation, by forfeiture of lands, or movables, or both, or of the profits of lands for life; others induce a disability of holding offices or employments, being heirs, executors and the like. Some, though rarely, occasion a mutilation or dismembering, by cutting off the hand or ears; others fix a lasting stigma on the offender by slitting the nostrils, or branding on the hand or cheek. Same are merely percuniary by stated or discretionary fines; and lastly, there are others which consist principally in their ignominy, though most of them are mixed with some degree of corporal pain; and these are inflicted chiefly for such crimes as either arise from indigence or render even opulence disgraceful; such as whipping, hard labor in the house of correction or otherwise, the pillory, the stocks, and the ducking-stool." What was meant by drawing

was tying the culprit's feet to a horse's tail and dragging him
along the ground to the gallows.   For this drawing the English
had Bible precedent, as we find in Sharswood's Blackstone, Book
4, page 93, note, "This punishment for treason, Sir Edward Coke
tells us, is warranted by divers examples in Scripture; for Joab
was drawn, Bithan was hanged, Judas was emboweled, and so of
the rest."   It was the infliction of such cruel judgments in the
days of the tyrant Stuarts that caused the insertion in the Eng-
lish Bill of Rights in 1688 of this clause, and caused its presence
in American Constitutions, national and state.   But it refers
only to punishment of such cruel character.   It does not trench
upon that wide power of the legislature to say what are offenses
and fix their punishment, "so long as they do not provide cruel
and unusual punishments, such as disgraced the civilization of
former ages, and make one shudder with horror to read of them,
such as drawing, quartering and burning."   *Whitten* v. *State,*
47 Ga. 301.   A free colored man was convicted of larceny of
$100. and was sentenced to receive thirty-nine stripes on his
bare back and be sold as a slave and transported and banished
beyond the limits of the United States.   A statute authorized
that severe punishment.   The General Court of Virginia said
that the constitutional provision was not designed to control the
legislative right "to determine *ad libitum* upon the adequacy of
punishment, but is merely applicable to the modes of punish-
ment."   *Aldridge Case,* 2 Va. Cases 447.   A man was convicted
of keeping a gaming table.   Under statute he was subject to
punishment of imprisonment in the jail not less than one month
nor more than six on low, course diet, and punished with stripes
to be inflicted at one or different times.   It was held that the
act was not repugnant to the bill of rights, and that whipping
was not an "unusual" punishment in the constitutional sense,
though it might consist of several whippings.   *Wyatt's Case,*
6 Rand. 694.   How can we say that the statute before us inflicts
cruel punishment when our statutes have punished with death,
lifelong imprisonment and fines, and forfeiture of instruments
of crime through centuries?   Nobody can question their valid-
ity.   Inflicting death by electricity is unusual, in a sense, a new
mode, but held not contrary to the prohibition.   Not as cruel
as hanging, which is surely not prohibited.   *In Re Kemmler,*
136 U. S. 436, 446.   The court said punishments are cruel when

they involve torture or lingering death; but punishment by death is not such. In *Wilkerson* v. *Utah,* 99 U. S. 130, 135, it was held that execution of death sentence by shooting does not violate this clause. The statute punished murder by death, by shooting, hanging or beheading. It was held not to be invalid. It does not clearly appear that the court would have approved the sentence, if there had been judgment by beheading, but did not condemn the act. Beheading would be no more cruel than hanging, not so much so. The court said: "Difficulty would attend the effort to define with exactness the extent of the constitutional provision which provides that cruel and unusual punishments shall not be inflicted; but it is safe to affirm that punishments of torture, such as those mentioned by the commentator referred to, and all others in the same line of unnecessary cruelty, are forbidden by that amendment to the Constitution. Cooley, Const. Lim. (4th Ed.) 408; Wharton, Cr. L. (7th Ed.) § 3405." The provision does not affect legislation providing imprisonment for life or years, or death by hanging or electrocution, and if it did the laws for the punishment of crime would give no security. *Hobbs* v. *State,* 408 L. R. A. 774. This interdict applies to such punishment as amounts to torture, like drawing, quartering, burning at stake, cutting off nose, arms or limbs, starving to death, or such as were inflicted by the act of Parliament in 22 Henry VIII, whereby the prisoner was ordered to be thrown into boiling water and boiled to death for poisoning. *State* v. *Williams,* 77 Mo. 310. The word "cruel" as used in the constitution was intended to prohibit torture, agonizing punishment, but never intended to "abridge the selection of the law making power of such kind of punishment as was deemed most effective in the suppression of crime." *Garcia* v. *Territory,* 1 N. M. 415. See 35 L. R. A. 561, for a fine collection of authorities upon this subject. The late case of *Weems v. United States,* 30 Sup. Court Reporter 544, discusses this subject, and it is there said that the provision in question is intended to veto statutes inflicting such cruel punishments as had been inflicted in England above mentioned. The same principle will be found stated in *O'Neil* v. *Vermont,* 144 U. S. 323. In short, the text writers and cases say that the clause is aimed at those ancient punishments, those horrible, inhuman, barbarous inflictions. We

can by no means say that the statute before us falls under this ban.

So, I conclude that this act does not violate the constitution in its injunction against "cruel and unusual punishment." When the court said in the *Aldridge Case* that the provision was not designed to control the Legislature in determining at its pleasure upon the *adequacy* of the punishment, but merely to the *modes* of punishment, it is possibly right, because the Virginia Bill of Rights prohibited cruel and unusual punishments, but did not contain those words in our constitution, "Penalties shall be proportioned to the character and degree of the offense." This certainly does not only, if at all, refer to the *mode* of punishment, but to the degree, extent and quality. Even without such a clause, under the words "cruel and unusual," it has been held that imprisonment for too long a time, though imprisonment is not cruel or unusual, is forbidden by those two words. *Weems Case, supra.* Surely under our constitution fines so excessive, imprisonment so long, looking to the offense, as to shock our feelings of humanity, conscience, justice and mercy would be branded by this clause. I suppose that a sentence for years to the penitentiary for assault and battery attended with no serious results, or long imprisonment in jail for profane swearing would fall under that clause. But it is established everywhere that the Legislature has large discretion as to punishment in kind and degree. Can we say that this act which fixes punishment at a fine of from fifty to two hundred and fifty dollars and imprisonment from six months to one year is so disproportionate to the offense as to be unconstitutional? Counsel says that it is unusual and severe and drastic. Drastic and severe it is, but not beyond the scope of legislative authority. The evident purpose of the new statute is to protect·Sunday from profanation and desecration by not only carrying on a business, but from drunkenness. Through the centuries Sunday has been protected from secular business and desecration by statutes of more or less severity. The great majority of people, whether members of the church or not, regard Sunday as a day of rest and peace and holiness, and approve laws to protect it from desecration. Of course, the open saloon would signally operate to its profanation. We cannot therefore say that this statute imposes for this offense a punishment disproportionate to it.

We cannot thus deny the power of the Legislature. As said in the *Weems Case:* "We disclaim the right to assert a judgment against that of the legislature, of the expediency of the law, or the right to oppose the judicial power to the legislative power to define crimes and fix their punishment, unless that power encounters in its exercise a constitutional prohibition. In such case, not our discretion, but our legal duty, strictly defined and imperative in its direction, is invoked. Then the legislative power is brought to a power superior to it for the instant. And for the proper exercise of such power there must be a comprehension of all that the legislature did or could take into account,— that is, a consideration of the mischief and the remedy. However, there is a certain subordination of the judiciary to the legislature. The function of the legislature is primary, its exercise fortified by presumptions of right and legality, and is not to be interfered with lightly, nor by any judicial conception of its wisdom or propriety. They have no limitation, we repeat, but constitutional ones, and what those are the judiciary must judge. We have expressed these elementary truths to avoid the misapprehension that we do not recognize to the fullest the wide range of power that the legislature possesses to adapt its penal laws to conditions as they may exist, and punish the crimes of men according to their forms and frequency."

The Legislature has a wide power and has established wide practice in dealing with the evil of intoxicating liquors. All over the Union for years and years statute law has been growing more and more rigid and rigorous, and peculiarly in late years. This is so much the case that many people say that these laws are so rigid and comprehensive and severe as to amount to injustice seeing that license is granted on payment of heavy taxes, and the privilege so restricted as as to sometimes render the business practically unprofitable; but the legislatures look upon the sale of intoxicating liquors as an evil as we are bound to say from a view of the large volume of statute law of the different states.

It occurred to me that this act might be unconstitutional on the theory that it violates constitutional law in prohibiting to the citizen his *use* of his property for innocent purposes. It says that he shall not enter the saloon for innocent purpose, to sleep,

to cook his meals, to secure his money from theft forgotten in his drawer, to preserve his property from leakage of water pipes or from fire. It seems questionable to me in this respect, though not urged by counsel. The statute absolutely prohibits any use of the room or place. Whether entrance from stringent necessity would be excused by the incorporation of an exception by the courts we do not say. Cases differ as to this. 23 Cyc. 190. Perhaps it would be like the case of some ancient statute or law which forbade the drawing of blood, but which was held not to apply to the surgeon or physician drawing blood to save life. *Morganstern* v. *Com.,* 94 Va. 788, point 4. This statute makes no express exception. Our constitution gives express power to the Legislature to either regulate or prohibit the sale of liquors. This is a very wide power vesting the Legislature with plenipotential powers to accomplish the end. There is no right in any person to engage in this business in such sense as to remove it from legislative control, not any vested right in those having license which prevents it being afterwards regulated or even forbidden by statute. *McKinney* v. *Town of Salem,* 77 Ind. 213. The state has the right to prohibit, restrict or regulate all sales of intoxicating liquors, and to inflict penalties therefor and for the abatement of property used for the forbidden purpose. *Kidd* v. *Pearson,* 128 U. S. 1; *Mugler* v. *Kansas,* 123 U. S. 623. It may require saloons to be closed on certain days. There have been many decisions up on statutes like this held constitutional. *Hedrick* v. *State,* 101 Ind. 565. Entering a saloon for any purpose though innocent on Sunday has been held to be a violation of such statute. *Moses* v. *State,* 78 Ga. 110; *Rosenthol* v. *Hobson,* 77 N. W. 488; *People* v. *Waldvogel,* 49 Mich. 337. Even to clean the saloon, or though it be an entrance to a dwelling. *People* v. *Talbott,* 120 Mich. 486, and *People* v. *Waldvogel, supra.* The offense consists in not keeping the saloon closed on Sunday, and it is not material whether or not any sales are made, nor what is the saloon keeper's intent in not keeping it closed, nor whether any one was seen to enter or depart from it. *State* v. *Schell,* 117 N. W. 504; *State* v. *Fairchild, Id.* 506; Black on Intox. Liq. 393. If he keep it open but for a moment it is violation of the statute and there is no purpose for which the statute authorizes it to be open. As held

in *Moses* v. *State* 78 Ga. 110 and *Klug* v. *State,* Id. 734, and *Kroer* v. *People,* 78 Ill. 294.

So our conclusion is that we cannot hold as unconstitutional the first and third sections of the act creating the offense and imposing the penalty. The case does not involve the second section authorizing officers to close places conducted in violation of the act and authorizing officers to arrest without warrant.. We say nothing as to that section, it being ·separate and distinct from the other and not involved in this case.

We affirm the judgment. *Affirmed.*