STATE OF WEST VIRGINIA
**Respondent,**

**vs.) No. 17-1112** (Wirt County No. 17-F-9)

**DALE FREEMAN ELSWICK,**
**Petitioner.**

**FILED**
**June 3, 2019**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

The petitioner, Dale Freeman Elswick, by counsel Dana F. Eddy and Brendan Doneghy, appeals the Circuit Court of Wirt County's November 20, 2017, order denying his motion for a new trial and sentencing him on his burglary conviction following a jury trial. The respondent State of West Virginia ("State"), by counsel Patrick Morrisey, West Virginia Attorney General, and Shannon Frederick Kiser, Assistant Attorney General, filed a response. The petitioner asserts that the State's evidence was insufficient to prove that he broke and entered a "dwelling house" and, therefore, insufficient to convict him of burglary.

Upon consideration of the standard of review, the briefs, the appendix record presented, and oral argument, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the order of the circuit court is appropriate under Rule 21 of the Rules of Appellate Procedure.

## I. Facts

On September 9, 2016, William Ward called the Wirt County Sheriff's Department to report a burglary at a neighboring house that he kept an eye on for the out-of-state owner, Lois Blubaugh ("Lois"). The house suffered flood damage in 2004. Prior to the flood, Lois's daughter, Pam Blubaugh ("Pam"), had resided in the house.[1] No one has lived in the house since the 2004 flood. Following a criminal investigation, the petitioner was indicted on March 27, 2017, on one count of "Burglary by unlawfully and feloniously, breaking and entering the dwelling house of Lois Jean Blubaugh located at 48 Daniel's Run Road, Palestine, West Virginia" in violation of West Virginia

---

[1]It appears from Mr. Ward's testimony that Pam had resided in the house with Jim Jenkins, who died in 2012. Following Mr. Jenkins's death, Pam acquired ownership of the property, which she then conveyed to her mother's revocable trust.

1

Code § 61-3-11 (2014).[2] The petitioner's one-day trial was held on September 18, 2017. The State presented the testimony of Mr. Ward, who explained that although the subject house was flooded in 2004, and the utilities were disconnected, there were no exterior indicators that the house had been flooded. Mr. Ward described the house as in "good shape" structurally, adding that the roof was fine; there were no broken windows in the house; and the front deck was solid. He stated he had earlier placed "no trespassing" signs around the property. Mr. Ward explained that he routinely watched over the house for Lois and Pam; that he made note of its exterior three or four times a day as he would drive by it; and that he had never seen the front storm door or main door open. According to Mr. Ward, Pam and Lois checked on the property "once a year or so," noting that Pam "still had a lot of personal belongings in the house . . . ."

---

[2]At the time of this crime, West Virginia Code § 61-3-11 provided:

> (a) Burglary shall be a felony and any person convicted thereof shall be confined in the penitentiary not less than one nor more than fifteen years. If any person shall, in the nighttime, break and enter, or enter without breaking, or shall, in the daytime, break and enter, the dwelling house, or an outhouse adjoining thereto or occupied therewith, of another, with intent to commit a crime therein, he shall be deemed guilty of burglary.
>
> (b) If any person shall, in the daytime, enter without breaking a dwelling house, or an outhouse adjoining thereto or occupied therewith, of another, with intent to commit a crime therein, he shall be deemed guilty of a felony, and, upon conviction, shall be confined in the penitentiary not less than one nor more than ten years.
>
> (c) The term "dwelling house," as used in subsections (a) and (b) of this section, shall include, but not be limited to, a mobile home, house trailer, modular home, factory-built home or self-propelled motor home, used as a dwelling regularly or only from time to time, or any other nonmotive vehicle primarily designed for human habitation and occupancy and used as a dwelling regularly or only from time to time.

In 2018, the Legislature amended this statute, eliminating subsection (b), which had provided for a penalty of a one to ten-year term of imprisonment if a dwelling house was entered during the daytime without breaking. Subsection (a) was revised to provide for a penalty of one to fifteen years imprisonment, regardless of whether a person breaks and enters, or enters without breaking, a dwelling house and without any distinction for daytime or nighttime entry. In the current burglary statute, the prior subsection (c) is now subsection (b) with some minor modifications. We will use the 2014 version under which the petitioner was indicted.

Testifying further, Mr. Ward stated that on the day in question, he saw a vehicle he did not recognize parked outside the subject house. He drove over to the house and blocked the egress of the unknown vehicle with his own vehicle. He observed a gun rack and mirror on the front porch and the petitioner exiting the house carrying light fixtures and a large screw driver. He also observed fresh marks on the front door jamb that looked as if someone had pried the door latch loose.

Mr. Ward confronted the petitioner as he came out of the house, asking him, "[W]hat are you doing?" When the petitioner responded that he was "getting a few things" from the house because he thought it was abandoned, Mr. Ward told the petitioner, "Well, it's not. They just don't live there right now." Mr. Ward oversaw the petitioner's return of the items to the house and directed the petitioner to show him the trunk of his vehicle to assure himself that nothing was being taken. Sometime after the petitioner departed, Mr. Ward telephoned the local Sheriff's office to report the crime. Wirt County Deputy Dillon Goodnight spoke to Mr. Ward and visited the house a few days later.

The State's next witness was Deputy Goodnight. The deputy testified to observing evidence of recent marks on the front door jamb where it looked as if the front door had been pried open. When questioned regarding the condition of the house, the deputy stated the house was not "a bad looking house at all on the outside" and that all the windows and doors were intact. He did note that the surrounding foliage was overgrown and he could tell that no one had been there in a while.

In further describing his investigation, Deputy Goodnight testified that he interviewed the petitioner twice and each time he admitted that he had gone into the house and claimed the front door was already opened; that he thought the house was abandoned; and that he was going to take a few things. Deputy Goodnight also testified concerning his interview of Pam Blubaugh, who "seemed kind of distraught" when he told her what had happened at the house. The deputy added that when he informed Lois Blubaugh that someone had broken into her house, she expressed her desire to pursue charges because "it was her house and someone was in it" and "they had intentions" of repairing the house and "moving back in."

On cross-examination, Deputy Goodnight indicated he has observed problems with the interior of the house, such as floor boards coming up and part of the living floor being sunken. When asked if he saw mold in the house on items and on the walls, he testified that he observed some white stuff, but he did not know what it was; he later testified that he believed the substance was either mold or mildew.[3] In response to the inquiry of whether the house was habitable, the deputy replied, "You can't live in it right now." The photographs the deputy had taken of the house were admitted into evidence.

---

[3]On re-direct examination by the State, Deputy Goodnight testified, "Like I told [defense counsel], I'm not sure exactly what was on the walls."

The State's final witness was Lois Blubaugh. She testified that in 2012, her daughter Pam deeded the house to the Blubaugh Revocable Trust for which she (Lois) is the owner and trustee.[4] Lois stated that prior to a flood in 2004, Pam had lived in the house and she had stayed there when she visited Pam, but that Pam had not lived in the home since it flooded. Lois testified that the property taxes were current; that the contents of the home had value to her; and that she visited the property at least annually to make certain the doors and windows were locked. She added that Pam checked on it more frequently. Testifying further, Lois stated that she had turned down prospective buyers for the property because it was her intent for Pam to move back into the house, explaining that Pam "loves the property" and "would like to move back on that property." Lois confirmed that the home needed repairs[5] and that she had made plans in that regard, although there had been some delay due to her health problems. She testified that she had explored companies that can repair flood damage; that she currently had a piece of property for sale in Pennsylvania; that she would use the proceeds from that sale to repair the house so that Pam "could move back there"; and that she would again visit Pam there.

After the State rested its case, the petitioner moved for a directed verdict of acquittal, arguing that the State had failed to prove that the house was a "dwelling house" under the burglary statute, West Virginia Code § 61-3-11.[6] He argued that all of the objective evidence at trial showed the house had been uninhabitable since 2004, and that no one had lived in the house since that time. The State countered that under West Virginia law, a "dwelling house is a dwelling house until nobody intends to live there any longer." The circuit court denied the petitioner's motion and found that the evidence showed it is the owner's intent to repair the house so that her daughter can return to live there. The circuit court further ruled it was "a question of fact for the jury whether [the house] is a dwelling house." The defendant did not call any witnesses at trial.

Regarding what constitutes a "dwelling house" for purposes of the crime of burglary, the trial court instructed the jury as follows:[7]

---

[4] Lois explained that Pam transferred ownership of the house to her because she could not "afford to pay the taxes and everything on it. So, rather than lose it, she turned it over to me."

[5] Lois testified that the water source for the property was a well, but that the electricity to the property had been disconnected.

[6] *See supra* note 2.

[7] The language in this instruction was taken from the language of the burglary statute, *see supra* note 2, as well as this Court's precedent, as discussed *infra*. The petitioner has not assigned any error concerning the jury instructions, and his counsel confirmed during oral argument that the jury was instructed correctly on the law.

The term "Dwelling House" means any structure primarily designed for human habitation and occupancy and used as a dwelling regularly or from time to time.

A building suitable for residential purposes, having been so designated and used, being equipped with household furnishings, remains a dwelling house though temporarily unoccupied, if the absence of the householder be with the intent to return. Entry of such temporarily unoccupied building by breaking and entering, with intent to commit a larceny therein[,] constitutes Burglary.

A structure is no longer a "dwelling house" for purpose of West Virginia's Burglary Statute, WV Code 61-3-11, when its occupants leave it without any intention of returning.

During closing arguments, the State argued that the property was not abandoned; that the damage to the home was all interior; and that the exterior gave no outward indication as to the condition of the interior. The State further argued that a "dwelling house is a dwelling house if someone lived in it, either full-time or part-time." Arguing futher, the State asserted that whether the house was habitable did not "come into play[,]" highlighting Lois Blubaugh's testimony concerning her intent to restore the property so that her daughter, who previously lived there, could return to do so. Defense counsel argued that a house remains a "dwelling house" if it is lived in regularly or from time to time and that being temporarily unoccupied does not mean every thirteen years, which belied any intent to fix the house to return to live in it. Counsel further argued that the evidence showed that the petitioner reasonably thought the house was abandoned; therefore, he did not commit burglary.

Following its deliberations, the jury returned a verdict finding the petitioner guilty of burglary as charged in the indictment. The petitioner moved for a new trial, arguing that the verdict was against the manifest weight of the evidence on the sole element of whether the property was a "dwelling house" and that the State should have charged him under the breaking and entering statute, which refers to a "house . . . other than a dwelling house."[8] The circuit court denied the motion, stating, in part, that there was evidence of intent to return; that the house was a dwelling house under West Virginia law; and that the "jury is the finder of fact and the jury found that it was a dwelling house, and the matter was thoroughly argued before the jury."

The circuit court sentenced the petitioner to one to fifteen years imprisonment. The court then suspended that sentence and placed the petitioner on probation for three years. The petitioner appeals.

---

[8]W.Va. Code § 61-3-12 (2014).

## II.  Standard of Review

The petitioner challenges the sufficiency of the State's evidence that the subject house was a "dwelling house" in order to convict him of burglary in violation of West Virginia Code § 61-3-11. As we explained in syllabus point one of *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995):

> The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt.  Thus, the relevant inquiry is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

For purposes of conducting this inquiry, our decision in *Guthrie* provides us with further guidance:

> A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden.  An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution.  The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt.  Credibility determinations are for a jury and not an appellate court.  Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt.

*Id.* at 663, 461 S.E.2d at 169, syl. pt. 3, in part.  Moreover, "[w]hen a criminal defendant undertakes a sufficiency challenge, all the evidence, direct and circumstantial, must be viewed from the prosecutor's coign of vantage, and the viewer must accept all reasonable inferences from it that are consistent with the verdict."  Syl. Pt. 2, in part, *State v. LaRock*, 196 W.Va. 294, 470 S.E.2d 613 (1996).  Bearing these rigorous standards in mind, we proceed to determine whether the petitioner is entitled to relief from his burglary conviction.

## III.  Discussion

The petitioner argues that the evidence at trial was insufficient to convict him of burglary. Citing the jury instruction that the term "dwelling house" means "any structure primarily designed for human habitation and used as a dwelling regularly or from time to time[,]" the petitioner asserts that no rational jury could have found from the evidence that the house he entered was a "dwelling house" as it had neither been occupied "regularly" nor "from time to time" since it was flooded in 2004.  He further contends that an owner's intent to return is only relevant if the structure could be returned to for occupancy and that the subject house could not.  The petitioner relies upon various

arson cases from other jurisdictions for his habitability argument[9] and likened the flood damaged home in *State v. Anderson*, 975 N.E.2d 556 (Ohio Ct. App. 2012), a burglary case, to the subject house. In *Anderson*, the Ohio court reversed a burglary conviction, finding a house, which was unfit for human habitation and without any indication that the owner had undertaken repairs, did not "support the conclusion that the house was only temporarily vacant or temporarily uninhabitable" notwithstanding its former purpose.[10] *Id.* at 560.

The State argues that the petitioner cannot meet his heavy burden under *Guthrie* to overturn the jury's finding that the subject house was a dwelling house. 194 W. Va. 657, 461 S.E.2d 163. Maintaining that its evidence was more than sufficient to convict, the State relies upon this Court's precedent that a temporarily vacated or unoccupied structure ceases to be a dwelling house *only if* there is no intent of the householder or occupant to return, which is a jury question. The State relies upon its evidence at trial, including the testimony of the owner, Lois, concerning her intent to repair the home so that the prior occupant, her daughter, Pam, who loved the house, could return to live there.

It has long been the law in West Virginia that a house ceases to be dwelling house when the occupant, owner, or householder, as this Court has used those terms, leaves with no intent to return.

---

[9]Those cases differ from the subject house and our precedent in meaningful ways, including that the structures in those cases either had obvious indicia of disrepair signaling an intent to abandon, or the owner's intent did not control. *See Fillman v. State*, 251 A.2d 557 (Del. 1969) (observing that the structure was dilapidated; the windows were broken; and its one door was left open and it had no furniture); *People v. Reeves*, 528 N.W.2d 160, 162 (Mich. 1995), *superceded on other grounds by statute as stated in People v. Nowack*, 614 N.W.2d 78 (2000) (noting that the siding had been removed from the house leaving only a wood frame and that the foundation had been weakened by the removal of bricks); *People v. Foster*, 302 N.W.2d 862, 864 (Mich. Ct. App. 1981) ("The uncontradicted testimony of . . . the owner of the building, indicates that she no longer wanted the house and had unsuccessfully sought to deed the property back to the mortgage company. . . . The windows in the building had been broken out, and the back door was kicked in."); *People v. Reynolds*, 187 N.W.2d 524, 525 (Mich. Ct. App. 1971) (per curiam) (affirming the petitioner's conviction on a sufficiency of the evidence challenge and observing that the jury had been instructed properly that a building could "lose its status as a dwelling house by reason of non-occupancy and disrepair"; that "the condition of this disrepair must be such as would communicate to an observer an apparent intent of the owner to abandon its function as a place in which people live"; and that the "undisclosed intention of the owner does not control"); *People v. Reed*, 163 N.W.2d 704, 705-06 (Mich. Ct. App. 1968) (observing that the house was dilapidated, vandalized, and boarded up to prevent ingress and egress).

[10]There are significant factual differences between the instant matter and *Anderson*, including that in *Anderson*, the house was described in a letter to the city as abandoned, and the city had condemned the house; posted it as being condemned; and sought to demolish it. *Anderson*, 975 N.E.2d 556. None of those factors are present here.

In *State v. Scarberry*, 187 W.Va. 251, 418 S.E.2d 361 (1992), from which language was borrowed for purposes of instructing the jury, the Court addressed what constitutes a dwelling house in the context of defendant Scarberry's argument that the evidence was insufficient to convict him of burglary where the owners of a mobile home had "abandoned it without the intent of returning." *Id.* at 253, 418 S.E.2d at 363. In analyzing the defendant's argument, the Court explained that

> [i]n a number of cases this Court has indicated that a building suitable for residential purposes, having been so designated and used, and being equipped with household furnishings, constitutes a dwelling house. *See*, *e.g*., *State v. Louk*, 169 W.Va. 24, 285 S.E.2d 432 (1981); *State v. Bair*, 112 W.Va. 655, 166 S.E. 369 (1932); *State v. Williams*, 40 W.Va. 268, 21 S.E. 721 (1895). In each of these cases, the Court addressed the question of whether a dwelling house, when temporarily unoccupied or temporarily vacated by its previous occupants, ceases to be a dwelling house. The general rule enunciated in each of the cases is that the structure remains a dwelling house, although temporarily unoccupied, if the absence of the householder is with the intent to return. *See especially State v. Bair, supra.* It is further recognized in the *Bair* case that entry of such a temporarily unoccupied building with the intent to commit a felony or any larceny therein constitutes a burglary.

*Scarberry*, 187 W.Va. at 254, 418 S.E.2d at 364.[11] After exploring cases from other jurisdictions that addressed when a structure ceases to be a dwelling house, the Court concluded that "a structure is no longer a 'dwelling house' for the purposes of West Virginia's burglary statute . . . when its occupants leave it without any intention of returning." *Id.* Because the owners had permanently abandoned their mobile home with no intent to return and, in fact, wanted the lender to repossess it, the Court found the mobile home was no longer a dwelling house and reversed the defendant's burglary conviction. *Id.* at 255, 418 S.E.2d at 365. Significantly, rather than imposing a temporal limitation on how long a householder, owner, or occupant could be gone before a house is deemed to be permanently abandoned, or establishing a habitability standard for a dwelling house, this Court's precedent uniformly looks to whether the owner, householder or occupant intends to return.

The status of the subject house as a "dwelling house" was a jury question. The jury was correctly instructed on the law that the term "dwelling house" means "any structure primarily designed for human habitation and occupancy and used as a dwelling regularly or from time to time" and that "[a] building suitable for residential purposes, having been so designated and used, being equipped with household furnishings, remains a dwelling house though temporarily unoccupied, if

---

[11]In both *Scarberry* and *Bair*, 112 W.Va. 655, 166 S.E. 369, the Court used the term "householder." The term "householder" is defined, in part, as "[s]omeone who owns or is in charge of a house." Black's Law Dictionary (10th ed. 2014). As the current owner of the house, Lois is the householder. These cases also use the term "occupant." It is undisputed that Pam had occupied the house.

8

the absence of the householder be with the intent to return."[12]  The evidence clearly demonstrated that the Blubaugh house was designed and designated for human habitation and occupancy, and it had been used as a dwelling house by Pam, and Lois had visited Pam there.  Although the house had been unoccupied for some time when the petitioner broke and entered it with the intent to commit larceny, it still embodied characteristics consistent with residential occupancy.  The State's evidence showed that the exterior of the house was in good repair and that the interior contained furniture, furnishings, and personal belongings that had value to Lois, as well as to the petitioner, who was endeavoring to steal items from the house when Mr. Ward intervened.  Upon its consideration of this evidence, the jury accurately determined that the house was a dwelling house.

The jury was also correctly instructed that "[a] structure is no longer a 'dwelling house' for the purpose of West Virginia's Burglary Statute, WV Code 61-3-11, when its occupants leave it without any intention of returning."  The State proved this intent through the testimony of Lois, the current owner, and Mr. Ward.  The evidence showed that Mr. Ward vigilantly fulfilled the request of Pam and Lois that he keep an eye on the property for them, and that Lois visits the house at least annually, and Pam more often. The evidence further showed that the property taxes are kept current and that offers to purchase the property had been declined because of the intent to return to live there.  Lois testified that she intended to repair the house so that Pam, who loves the house, could return to live there, and that she would, once again, visit Pam there.  While many years had passed since the flood, the jury also heard Lois's testimony that she had a piece of property for sale in Pennsylvania; that she planned to use the proceeds from that sale to fund the repairs; and that she had already explored companies who could make the necessary repairs.

A review of the entirety of the State's evidence shows that the house had the customary indicia of a dwelling house at the time of the burglary.  The Blubaughs' efforts to protect the house, including keeping the doors and windows locked, regularly visiting the property, and having Mr. Ward surveil the property on a nearly daily basis, all demonstrated that both Lois and Pam cared for the house and intended to return to it.

The petitioner has a heavy burden in seeking to overturn his conviction based upon an alleged insufficiency of the evidence.  *See Guthrie*, 194 W.Va. at 663, 461 S.E.2d at 169, syl. pt. 3, in part.  The jury heard the parties' arguments, weighed the evidence, and was properly instructed on the law.  Having reviewed the evidence in the light most favorable to the prosecution and having credited all inferences and credibility assessments that the jury might have drawn in favor of the prosecution,[13] we cannot say that a reasonable jury could not have found the petitioner guilty of burglary beyond a reasonable doubt.  Applying our well-established test for whether a previously occupied, but currently unoccupied, house continues to be a "dwelling house" for purposes of

---

[12]The appendix record does not contain the parties' proffered jury instructions; therefore, we do not know whether the petitioner offered an instruction that to be a dwelling house, it has to be currently habitable.  He has not assigned any instructional error.

[13]*See LaRock*, 196 W.Va. at 299, 470 S.E.2d at 618, syl. pt. 2, in part.

9

burglary, we are compelled to find the evidence was sufficient for the jury to convict the petitioner of burglary.[14]

## IV.  Conclusion

For the foregoing reasons, the petitioner's burglary conviction and sentencing are affirmed.

Affirmed.

**ISSUED:**   June 3, 2019

**CONCURRED IN BY:**

Chief Justice Elizabeth D. Walker
Justice Margaret L. Workman
Justice Tim Armstead
Justice Evan H. Jenkins
Justice John A. Hutchison

---

[14]We decline the petitioner's request for this Court to find that a house must be habitable before an owner or occupant can intend to return to it.  If the Legislature deems it proper to provide that for the crime of burglary, a dwelling house must be"habitable" and to provide a definition for what it means to be "habitable," it can do so.  *See* Syl. Pt. 2, *State v. Butler*, 239 W.Va. 168, 799 S.E.2d 718 (2017) ("'The Legislature has power to create and define crimes and fix their punishment[.]' Syl. Pt. 2, in part, *State v. Woodward*, 68 W.Va. 66, 69 S.E. 385 (1910).").